## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **REBECCA BOZARTH,** | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | |
| | * | **Case No.:  DLB-19-3615** |
| **MARYLAND STATE DEPARTMENT** | | |
| **OF EMPLOYMENT, *et al.*,** | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Rebecca Bozarth, an employee of the Maryland State Department of Education ("MSDE") and the State of Maryland (collectively, the "State"), alleges the State discriminated against her on the basis of disability, sexual orientation, and religion.  The State partially moved to dismiss Ms. Bozarth's claims.  Because the Eleventh Amendment bars Ms. Bozarth's claims arising under the self-care provision of the Family and Medical Leave Act ("FMLA") and Title I of the Americans with Disabilities Act ("ADA"), those claims are dismissed.  Because Ms. Bozarth failed to plausibly plead discrimination based on sexual orientation or religion, those claims are dismissed.  Finally, because Ms. Bozarth adequately stated a claim for disability discrimination under Section 504 of the Federal Rehabilitation Act ("Section 504") and the Maryland Fair Employment Practices Act ("MFEPA"), the State's motion to dismiss as to those claims is denied.

## I.    **Background**[1]

Ms. Bozarth is a heterosexual, Jewish female with a disability.  Am. Compl. ¶¶ 27 & 38,

---

[1] In resolving the State's partial motion to dismiss, I take the well-pleaded allegations as true. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

ECF 26.  Ms. Bozarth began working for the MSDE on May 30, 2012.  *Id.* ¶ 10.  She was hired as a "Child Care Licensing Specialist in the Skilled Service with the Division of Early Childhood Development Office of Child Care."  *Id.* ¶ 11.  She worked out of the MSDE Office of Child Care ("OCC") Region 12 in Frederick County.  *Id.* ¶ 22.  In that position, Ms. Bozarth was "responsible for overseeing a list of child care facilities, including, but not limited to[,] child care centers and family child care homes.  *Id.* ¶ 16.  Her day-to-day activities include "ensuring proper background checks on child care personnel, ensuring facilities meet background and training requirements, responding to family complaints[,] and conducting inspections of facilities."  *Id.* ¶ 17.  Up until June 2018, Ms. Bozarth "never received anything less than an outstanding performance evaluation."  *Id.* ¶ 103.  Additionally, up until September 2018, Ms. Bozarth "never received any written negative counseling, write-up, discipline[,] or similar negative feedback" about her job performance.  *Id.* ¶ 104.  She "was considered an employee [who] 'got stuff done . . .'" and was even "told that she needed to slow the pace of her work product because 'she was a state employee and state employees don't work at that pace' or words to this effect."  *Id.* ¶¶ 105–06.

Ms. Bozarth's direct supervisor is Kathy Long, who reports to Dolores Harmon.  *Id.* ¶¶ 41–42.  Ms. Harmon is the regional manager overseeing Regions 7 and 12.  *Id.* ¶ 18.  Jennifer Nizer, who is the Director of the OCC, "is in the supervisory chain of Ms. Harmon and Ms. Long."  *Id.* ¶¶ 80–81.  Finally, Lou Valenti is the Branch Chief.  *Id.* ¶ 84.  Her supervisors were aware of each of these aspects of her identity.  *Id.* ¶¶ 38, 21, 57, 61, 64, 83.  Ms. Bozarth alleges her Region 12 managers have formed a "clique."  *Id.* ¶¶ 23, 54, 82.  It is not clear whether Mr. Valenti is in the "clique."  Included in the "clique," however, is "Employee S," who is a lesbian, female secretary in Region 12.  *Id.* ¶ 24.  Ms. Bozarth asserts that "more than one member of [her] supervisory chain that [is involved in this case] are homosexual."  *Id.* ¶ 115.

Around June 2018, Employee S "determined that she no longer wanted to remain friendly with [Ms. Bozarth] and her coworkers"—all of whom are heterosexual. *Id.* ¶¶ 48–49. At this time, "Employee S cleaned out her office, refused to talk to [Ms. Bozarth] and her coworkers[,] and made day-to-day work inside [the] Region 12 office extremely difficult." *Id.* ¶ 50. Ms. Bozarth claims that after she and her coworkers alerted Ms. Long of Employee S's "odd and disruptive behavior," Ms. Long and Ms. Harmon "showed favoritism to Employee S" by taking Employee S's "side" and showed "animus towards [Ms. Bozarth]" due to Employee S's sexual orientation or membership in the clique and Ms. Bozarth's heterosexuality. *Id.* ¶¶ 52–62.

Ms. Bozarth alleges that her supervisor, Ms. Harmon, "would lead Region 12 and Region 7 employees in inappropriate workplace prayers." *Id.* ¶ 35. Ms. Bozarth alleges "Ms. Harmon led employs in saying 'grace' before meals" at Region 12 and 7 outings, and that grace "is a Christian religious custom." *Id.* ¶¶ 35–36. Ms. Bozarth does not further specify whether or when prayers were said during a normal workday. Another employee who is a Jehova's Witness "told Ms. Harmon that she would not be participating in the group parties because . . . the Jehova's [W]itness faith does not recognize holidays." *Id.* ¶ 37. "Ms. Harmon told the employee that the parties were mandatory." *Id.*

Ms. Bozarth "suffers from neurological Lyme disease and associated medical issues, including an anxiety disorder." *Id.* ¶ 65. In August 2018, Ms. Harmon planned a Region 12 office gathering at which no work was scheduled to be completed and attendance to which "was not an essential function of [Ms. Bozarth's] position." *Id.* ¶¶ 68–69, 74. Ms. Bozarth was aware at this time that Ms. Long had "made disparaging remarks about [another employee's] disability." *Id.* ¶ 71. About two weeks prior to the event, which was to take place on August 30, 2018, Ms. Bozarth verbally notified Ms. Harmon that her disability precluded her attendance at the gathering.

*Id.* ¶¶ 69–70, 72.  Ms. Bozarth does not specify what about her disability prevented her from attending the gathering.  Ms. Harmon denied the request, told Ms. Bozarth her attendance was mandatory, and "also told [Ms. Bozarth] she must submit medical documentation before making any decision." *Id.* ¶ 73.  Ms. Bozarth complained to the human resources department ("HR") "that Ms. Harmon denied her request for a reasonable accommodation." *Id.* ¶ 76.  HR requested a doctor's note explaining the medical necessity of her absence, which Ms. Bozarth provided. *Id.* ¶¶ 77–78.  Ms. Bozarth does not specifically state whether she ultimately attended the gathering.

### A. September 2018

On September 8, 2018, Ms. Bozarth aired numerous grievances to Ms. Nizer. *Id.* ¶ 83. Ms. Bozarth complained "that the supervisor led employees to say 'Grace' at [d]efendants' parties and that another employee, who claimed a religious exemption, was initially required to attend in violation of federal and state employment laws." *Id.* ¶¶ 81–83.  Further, she complained "about her being denied a reasonable accommodation, the issues with Ms. Harmon[,] and issues related to [Employee S]." *Id.* ¶ 83.  Ms. Bozarth subsequently was told she would have a meeting with Ms. Nizer and Mr. Valenti, the purpose of which "was to address the issues raised by [Ms. Bozarth.]" *Id.* ¶ 84.

The meeting, which took place on September 24, 2018, was not what Ms. Bozarth expected.  Both "Ms. Nizer and Mr. Valenti made accusatory remarks about [Ms. Bozarth's] treatment of [Employee S]." *Id.* ¶ 86.  Two days after this meeting, Ms. Long wrote up Ms. Bozarth "for allegedly starting an issue with [Employee S] regarding 'file [folders]'. . . [and] falsely accused [Ms. Bozarth] of treating [Employee S] poorly and of having a 'behavior/[attitude] issue' toward [Employee S]." *Id.* ¶¶ 87, 90.  Ms. Bozarth claims she "did not start any issues with [Employee S]." *Id.* ¶ 89.  "Instead, [Employee S] was the one instigating issues with [Ms.

4

Bozarth].”  *Id.*

On the morning of September 27, 2018, and after having been written up, Ms. Bozarth sent an email to her supervisors, Ms. Long and Ms. Harmon, in which she “complained that she was being unfairly treated in comparison to [Employee S].”  *Id.* ¶¶ 91, 93.  Ms. Bozarth also “complained that the situation with [Employee S] was causing…flare-ups of [her] disability…and that [she] needed the situation with [Employee S] to end as a result of her disability.”  *Id.* ¶ 92.

Later that morning, Ms. Bozarth was beckoned to Ms. Harmon’s office where Ms. Long was present and Ms. Nizer and Mr. Valenti were present by phone.  *Id.* ¶¶ 94–95.  Ms. Bozarth “was told that she was ‘being investigated[,]’” “that she had to ‘pack her things and leave ASAP[,]’” and “that her position was reassigned to the Montgomery County Office in Rockville, Maryland (Region 5).”  *Id.* ¶¶ 96–98.  “Ms. Nizer told [Ms. Bozarth’s] supervisor that ‘anything [Ms. Bozarth] left at the office should be put out on the sidewalk.’”  *Id.* ¶ 99.  Ms. Bozarth’s “supervisor was told to watch [Ms. Bozarth] so ‘[Ms. Bozarth] d[idn’t] steal files.’”  *Id.* ¶ 112.  And, as Ms. Bozarth was exiting the building, “Ms. Harmon told her[,] ‘I guess you thought you would call Baltimore and get me in trouble, looks like it backfired on you.’”  *Id.* ¶ 113.

**B.  Events After Ms. Bozarth’s Reassignment to Region 5**

The new office to which Ms. Bozarth was assigned was “more than a thirty minute commute from [her] home[,] . . . a 1.5 hour commute each way [with traffic].”  *Id.* ¶ 116.  Ms. Bozarth’s disability precludes “driving more than thirty minutes at a time[,]” and, in October 2018, Ms. Bozarth’s doctor provided a note stating as much.  *Id.* ¶¶ 117–18.  On or around October 9, 2018, Ms. Bozarth submitted a request for an accommodation, supported by her physician, based on her inability to commute more than thirty minutes at a time and requested medical leave because she could not make the commute then required of her.  *Id.* ¶¶ 118–21.  While awaiting the State’s

response, Ms. Bozarth was "disciplined for allegedly bullying [Employee S]." *Id.* ¶ 122. Ms. Bozarth contends the investigation unearthing this finding was a "sham," during which Employee S was not investigated. *Id.* ¶¶ 122–25. Ms. Nizer also informed Ms. Bozarth that her relocation to the Rockville office was permanent, Ms. Bozarth's presentation of evidence of her inability to travel to that office notwithstanding. *Id.* ¶ 126. Ms. Bozarth renewed her reasonable accommodation request for a worksite within her commuting capabilities on October 26, 2018. *Id.* ¶ 128. She also formally complained to Kim Johnson, a compliance officer, about the State's "discrimination and retaliation." *Id.* ¶¶ 129–35.

Ms. Bozarth returned to Region 12 on March 6, 2019, but not before she had drawn down over 200 hours of annual leave and 300 hours of sick leave and filed complaints with the Equal Employment Opportunity Commission and Maryland Commission on Civil Rights. *Id.* ¶¶ 135–46. Ms. Bozarth alleges that the State "did not begin to engage in the interactive process with [Ms. Bozarth] until [she] retained counsel . . . in December 2018." *Id.* ¶ 148. Her return to Region 12 was only partial in that she "was not returned to her original duty station[;]" "was prevented from attending training . . . [that] was a vital component of [her] position[;]" "was told not to converse with employees[,] . . . [who themselves] were told that they should ignore [Ms. Bozarth] if they came across [her] outside of work[;]" had her work schedule "scrutinized…more than similarly situated employees[;]" and was assigned "increased workloads in the magnitude of two-three times as much work as similarly situated employees." *Id.* ¶¶ 146, 161–62, 165–66, 176–77.

In addition, Ms. Bozarth received a negative performance evaluation in June 2019—the first in her time with the MSDE. *Id.* ¶¶ 151–52. The negative evaluation stated that her "performance was sub-par[,]" which "was premised on [Ms. Bozarth] not being in the office for a period of time." *Id.* ¶¶ 154, 156. During that period of time, Ms. Bozarth was using "ADA[-] and

MFEPA[-]qualifying leave." *Id.* ¶ 159.  After proceeding through the relevant procedural steps, Ms. Bozarth filed suit.  *Id.* ¶¶ 186–97; Compl., ECF 1.

Initially, Ms. Bozarth filed suit in both state and federal court.  Compl., ECF 1 in No. DLB-19-3615; Notice of Removal, ECF 1 in No. DLB-20-372.  In the notice of removal, the State indicated that Ms. Bozarth "filed an action against [it] in the Circuit Court for Frederick County, Maryland," and that "[b]oth the [s]tate and federal actions allege[d] identical facts and causes of action."  Notice of Removal 1–2 in No. DLB-20-372.  Indeed, the two complaints contain the same 12 counts.  *See* Compl. ¶¶ 186–374 in No. DLB-19-3615; Compl. ¶¶ 186–374, ECF 2 in No. DLB-20-372.  The State filed a consent motion to consolidate the cases for all purposes, ECF 17, which the Court granted, ECF 18.  The litigation is proceeding as Case No. DLB-19-3615.

Ms. Bozarth alleges unlawful acts, based on her sexual orientation, disability, and religion, in violation of state and federal employment and anti-discrimination laws.  Compl. ¶¶ 186–374. The State moved to dismiss Ms. Bozarth's complaint in part.  ECF 23.  Ms. Bozarth amended her complaint.  Am. Compl., ECF 26.  The State then moved to dismiss Ms. Bozarth's amended complaint in part.  Defs.' Mot., ECF 31.  The State's motion, having been fully briefed by the parties, is pending before the Court.  *See* Defs.' Mem., ECF 31-1; Pl.'s Opp'n, ECF 35; Defs.' Reply, ECF 40.  I find no hearing necessary.  *See* Loc. R. 105.6.  Ms. Bozarth alleges, as relevant to State's pending motion to dismiss, disability discrimination in violation of Section 504, 29 U.S.C. § 794; Title I of the ADA, 42 U.S.C. §§ 12111–12117; and the MFEPA, Md. Code Ann., State Gov't §§ 20-601 to 20-611.  She further alleges discrimination on the basis of her sexual orientation or religion in violation of the MFEPA and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–1 to 2000e–17.  Finally, Ms. Bozarth alleges the State violated the FMLA, 29 U.S.C. § 2615.

## II.   <u>Standard of Review</u>

The State moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defs.'
Mem. 1.  A Rule 12(b)(6) motion challenges "the legal sufficiency of a complaint" on the grounds
that, "even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law to state
a claim upon which relief can be granted."  *Thomas-Lawson v. Koons Ford of Balt., Inc.*, No. SAG-
19-3031, 2020 WL 1675990, at *2 (D. Md. Apr. 6, 2020) (citing *In re Birmingham*, 846 F.3d 88,
92 (4th Cir. 2017)); *see* Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the "complaint
need only 'give the defendant fair notice of what the . . .  claim is and the grounds upon which it
rests.'"  *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379,
387 (4th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))).  Stated
differently, "a complaint must contain 'a short and plain statement of the claim showing that the
pleader is entitled to relief.'"  *Cooke v. Caliber Home Loans, Inc.*, No. PWG-18-3701, 2020 WL
1434105, at *3 (D. Md. Mar. 24, 2020) (quoting Fed. R. Civ. P. 8(a)(2)).

## III.   <u>Discussion</u>

### A.  **Sovereign Immunity**

Defendants move to dismiss Ms. Bozarth's disability discrimination claim under Title I of
the ADA and her claim under the FMLA on the grounds that the State "is immune from suit
pursuant to the Eleventh Amendment."  Defs.' Mem. 7.  Ms. Bozarth does not dispute that either
the State of Maryland or the MSDE are entities cloaked in sovereign immunity.  *See* Pl.'s Opp'n
8–13; *see* Md. Code Ann., Educ. § 2-101.  Rather, Ms. Bozarth contends the State "waived
sovereign immunity through the enactment of the Maryland Tort Claims Act" ("MTCA"), Md.
Code Ann., State Gov't § 12-101 to 12-110.  Pl.'s Opp'n 8.  Ms. Bozarth further argues the State
waived its "Eleventh Amendment" immunity from suit in federal court by removing the case she

originally filed in state court, No. DLB-20-372, to the District of Maryland.  *Id.* at 11–13.  Ms. Bozarth addresses sovereign immunity and waiver under both Title I of the ADA and the FMLA by arguing that the MTCA generally constitutes a waiver of sovereign immunity as to "employment discrimination claims," and Ms. Bozarth advances no arguments unique to either the ADA or FMLA.  *See id.* at 8–13.  Accordingly, the Court analyzes defendants' immunity from these claims together.

The Eleventh Amendment guarantees that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State."  U.S. Const. amend. XI.  The Supreme Court interprets the Eleventh Amendment likewise to grant a state immunity from suits in federal court brought by its own citizens.  *Lapides v. Bd. of Regents of the Univ. Sys, of Ga.*, 535 U.S. 613, 616 (2002) ("The Eleventh Amendment grants a State immunity from suit in federal court by citizens of other States, U.S. Const., Amdt. 11, and by its own citizens as well, *Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1890).")); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States.  The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.") (internal citations omitted).  Further, Eleventh Amendment immunity extends to "state agents and state instrumentalities." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

The Eleventh Amendment's expansive reach, however, is not without limits.  The Fourth Circuit recognizes three exceptions to a state's Eleventh Amendment immunity:

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of

> constitutional authority. . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court.

*Lee-Thomas v. Prince George's Cty. Pub. Schs.*, 666 F.3d 244, 249 (4th Cir. 2012) (internal citations omitted) (internal quotation marks omitted).

Two of the three exceptions clearly do not apply in this case. Neither the State nor the MSDE is a "state official." *See id.*; Am. Compl. ¶ 4. Second, though a state's Eleventh Amendment immunity can be abrogated by an act of Congress, Congress failed to do so in enacting either Title I of the ADA or the self-care provision of the FMLA. The Supreme Court has made clear Congress did not validly abrogate the states' Eleventh Amendment immunity with respect to Title I of the ADA. *Garrett*, 531 U.S. at 368 (holding that, because Congress's authority to abrogate immunity via its power under § 5 of the Fourteenth Amendment "is appropriately exercised only in response to state transgressions" and the "legislative record of the ADA . . . fails to show Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled[,] Congress did not abrogate states' Eleventh Amendment immunity" as to Title I of the ADA); *see McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014) ("Sovereign immunity has not been abrogated for . . . Title I ADA claims."). Likewise, Congress failed to abrogate states' Eleventh Amendment immunity in legislating the self-care provision of the FMLA. *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 43–44 (2012), *aff'g* 626 F.3d 187 (4th Cir. 2010) ("To abrogate the States' immunity from suits for damages under § 5, Congress must identify a pattern of constitutional violations and tailor a remedy congruent and proportional to the documented violations. It failed to do so when it allowed employees to sue States for violations of the FMLA's self-care provision."). Therefore, the Eleventh Amendment shields the State from suit in federal court unless the State waived its

immunity.  *See Lee-Thomas*, 666 F.3d at 249.

Ms. Bozarth argues the State waived its Eleventh Amendment immunity through a two-part process.  Pl.'s Opp'n 8–13; *see id.*  First, Ms. Bozarth argues the State waived its sovereign immunity with respect to these "employment discrimination claims" in its own state courts through the enactment of the MTCA.  Pl.'s Opp'n 8–11 (citing Md. Code Ann., State Gov't §§ 12-101 to 12-110).[2]  Second, Ms. Bozarth argues the State, having waived its immunity in its own courts,

---

[2] The Court presumes Ms. Bozarth references the State's common law immunity at this point in her argument for three main reasons.  First, the MTCA's provisions make clear that "subtitle does not: . . . waive any right or defense of the State or its units, . . . including any defense that is available under the 11th Amendment to the United States Constitution."  Md. Code Ann., State Gov't § 12-103.  Second, "[a]n abundance of authority suggests that . . . the Eleventh Amendment serves to limit the jurisdiction of federal courts only . . . and that the Amendment has no application in state court proceedings."  *Zimmer-Rubert*, 973 A.2d at 241 n.6 (citing *Alden*, 527 U.S. at 760 (Souter, J., dissenting) (stating that the *Alden* majority recognized that the "the state forum render[ed] the Eleventh Amendment beside the point")) *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63–64 (1989) ("[T]he Eleventh Amendment does not apply in state courts."); *Hilton v. South Carolina Pub. Rys. Comm'n*, 502 U.S. 197, 204–05 (1991) ("[A]s we have stated on many occasions, the Eleventh Amendment does not apply in state courts.") (internal quotation marks omitted) (citations omitted).  Third, the Supreme Court has pronounced a "stringent" test for finding a State waived its Eleventh Amendment immunity.  *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 101 (4th Cir. 2019) (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675-76 (1999); *Allen v. Cooper*, 895 F.3d 337, 347 (4th Cir. 2018)).  "[I]n order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court."  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) (citing *Smith v. Reeves*, 178 U.S. 436, 441 (1900); *Great N. Life Ins. Co. v. Read*, 322 U.S. 47, 54 (1944)) (finding a statute that did not specifically indicate a willingness to be sued in federal court did not constitute a waiver of Eleventh Amendment immunity).  A reading of the statute makes clear the State did not waive its Eleventh Amendment immunity in enacting the MTCA, both because the Act explicitly says so, State Gov't § 12-103, and because its terms otherwise fail to meet the test's rigorous requirements.  The MTCA provides, in relevant part, that "[s]ubject to the exclusions and limitation in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this section."  Md. Code Ann., State Gov't § 12-104(a)(1).  The limitation of the waiver to "a court of the State" clearly falls short of the express consent to suit in federal court required to waive the State's Eleventh Amendment immunity.  *See State v. Sharafeldin*, 854 A.2d 1208, 1219 (Md. 2004) ("Section 12-201 precludes the State and its agencies from raising the defense of sovereign immunity in a contract action in 'a court *of* the State[,]'…meaning a court that is part of the Maryland judiciary.  There was clearly no intent on the part of the Legislature to

waived its Eleventh Amendment immunity through its litigation conduct by voluntarily removing No. DLB-20-372 from the Circuit Court of Frederick County to the United States District Court for the District of Maryland. *Id.* at 11–13 (citing *Lapides*, 535 U.S. 613; *Stewart v. North Carolina*, 393 F.3d 484 (4th Cir. 2005)).

Whether the State has waived its common law immunity is a matter of state law. *Dennard v. Towson Univ.*, 62 F. Supp. 3d 446, 450 (D. Md. Oct. 16, 2014) (citing *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 249 (4th Cir. 2012)). Waivers of sovereign immunity have been "strictly construed . . . in favor of the sovereign." *Zimmer-Rubert*, 973 A.2d 233, 240 (citing *Lizzi v. WMATA*, 845 A.2d 60, 65 (Md. 2003) (internal citations omitted)). This Court previously has applied a two-part test articulated in *Stern v. Board of Regents, University System of Maryland*, 846 A.2d 996, 1001 (Md. 2004). *See Dennard*, 62 F. Supp. 3d at 450. The two-part test asks: (1) whether the entity qualifies for sovereign immunity, and (2) if it does, whether the legislature waived the immunity. *Id.* (citing *Stern*, 846 A.2d at 1001). Satisfaction of the test's first part is not in dispute. Instead, Ms. Bozarth argues the State waived the immunity to which it was entitled in state court through the enactment of the MTCA, Md. Code Ann., State Gov't § 12-104. Pl.'s Opp'n 8–11.

The Maryland Court of Appeals has laid out the principles of statutory interpretation to be applied in determining whether a statute amounts to a waiver of the state's immunity:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology. . . . If statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. If there is no ambiguity in that language, either inherently

---

waive the State's Eleventh Amendment immunity in actions in Federal court or to waive its inherent sovereign immunity in actions filed in the courts of some other state.") (interpreting a parallel statute, Md. Code Ann., State Gov't § 12-201) (emphasis in original).

> or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends; we do not need to resort to the various, and sometimes inconsistent, external rules of construction, for 'the Legislature is presumed to have meant what it said and said what it meant.'  Nevertheless, we may resort to legislative history to ensure that our plain language interpretation is correct.  We avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.

*Zimmer-Rubert*, 973 A.2d at 241–42 (internal quotation marks omitted) (internal citations omitted); *see Dennard*, 62 F. Supp. 3d at 450 (citing state-court standards for statutory interpretation while applying the *Stern* test); *Lee-Thomas*, 666 F.3d at 252.

A plain reading of § 12-104 suggests that the State has not waived its common law sovereign immunity with respect to claims arising under Title I of the ADA or the self-care provision of the FMLA.  The MTCA provides, in relevant part, that "[s]ubject to the exclusions and limitation in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this section."[3]  Md. Code Ann., State Gov't § 12-104(a)(1).  The terms of § 12-104(a)(1) are clearly limited to tort actions.  Additionally, § 12-104 is entitled, "Waiver of State tort immunity."  Neither of Ms. Bozarth's causes of actions based on Title I of the ADA or the self-care provision of the FMLA relate to torts.  The claims the State challenges here relate only to federal employment law.

Ms. Bozarth argues this Court's holdings in *Royster v. Gahler*, 154 F. Supp. 3d 206, 217 (D. Md. Dec. 31, 2015), and *Bales v. Maryland Judiciary/Administrative Office of the Courts*, No. JFM-15-cv-3293, 2016 WL 6879902 (D. Md. Nov. 21, 2016), support her position that the State waived its common law sovereign immunity to employment discrimination claims when it enacted

---

[3] Paragraph two merely establishes a cap on the State's liability, "not to exceed $400,000 to a single claimant for injuries arising from a single incident or occurrence."  State Gov't § 12-104(a)(2).

the MTCA, but neither case is on point.  *See* Pl.'s Opp'n 8–11.  In both *Royster* and *Bales*, the Court considered only whether the MTCA's notice provision applied to state-law claims arising under the MFEPA; it did not address the waiver of sovereign immunity.  *See Royster*, 154 F. Supp. 3d at 217–20; *Bales*, 2016 WL 6879902, at *11–13.  Any discussion in *Royster* of sovereign immunity did not relate to the MTCA's waiver of sovereign immunity.  *See* 154 F. Supp. 3d at 215–17 (discussing the MFEPA's limited waiver of sovereign immunity); *id.* at 227–31 (discussing the Eleventh Amendment's bar on claims brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*).

Likewise, the Maryland Court of Appeals' holding in *Hansen*, on which *Royster* and *Bales* rely and which Ms. Bozarth references, does not suggest the term "tort" in State Gov't § 12-104 should cover federal employment law claims.  *See Hansen v. City of Laurel*, 25 A.3d 112 (Md. 2011); *Royster*, 154 F. Supp. 3d at 219–20; *Bales*, 2016 WL 6879902, at *12–13; Pl.'s Opp'n 9. In *Hansen*, the Maryland Court of Appeals affirmed dismissal of the plaintiff's suit, in which the plaintiff alleged violations of state and county employment laws committed by his employer, a local government entity.  25 A.3d at 124 & 124 n.3.  That court's opinion did not depend upon reading the plaintiff's employment action as a tort.  The court addressed only whether the plaintiff "was required to plead affirmatively in his complaint satisfaction of the notice obligation of the [Local Government Tort Claims Act ("LGTCA")]."  *Id.* at 129.  Observing first that it was "a longstanding principle of Maryland jurisprudence that the LGTCA notice provision is a condition precedent to maintaining an action directly against a local government or its employees," *id.* at 130, the Maryland Court of Appeals analyzed the effect of a failure to plead satisfaction of this condition on the plaintiff's lawsuit, *id.* at 131–39.

14

That the plaintiff in *Hansen* raised employment law claims ultimately had no bearing on the applicability of the LGTCA's notice provision then in effect because that provision was not limited to tort actions. It provided, in relevant part, that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury." *Id.* at 126 n.4 (citing Md. Code Ann., Cts. & Jud. Pro. § 5-304 (2007)). Thus, the Maryland Court of Appeals summarily concluded the notice requirement applied to the plaintiff's employment action because the notice provision, by its plain terms, applied to any action for unliquidated damages against a local government—not merely those sounding in tort. *See id.* at 130 n.7. Neither did the plaintiff in *Hansen* argue, should his pleadings otherwise have been sufficient, that the LGTCA provided a waiver of sovereign immunity he needed in order to sue the government:

> Hansen named only the City as a defendant, rather than an employee of the City. In the complaint, he provides that the "Defendant [is] the City of Laurel, Maryland, located in Prince George's County, Maryland," and "by code[,] subjects itself to Prince George's County's anti-discrimination ordinance." … Whether the City retained its immunity to such employment discrimination claims is open as well. Hansen suggests that the City "subjects itself" to liability through § 1–7.1 of its municipal code . . . . Aside from [§ 1–7.1,] no provision in the City's municipal code appears to reflect a waiver of immunity. . . . Although the issues of jurisdiction and waiver of immunity are sufficiently complex to warrant mention, we offer no analysis here because of the pleading defect in the present case.

25 A.3d at 138 n.15 (internal citations omitted). Thus, *Royster*, *Bales*, and *Hansen* do not support Ms. Bozarth's argument because they do not contain any substantive analysis of the effect of the MTCA's waiver of sovereign immunity.

To the extent Ms. Bozarth argues *Royster*, *Bales*, and *Hansen* create ambiguity in State Gov't § 12-104, the history of the statute suggests otherwise. The legislature first enacted the MTCA in 1981 "for the purpose of waiving the immunity of the State and its officials in certain tort actions." 1981 Md. Laws 1690. That Act limited the waiver to actions based on: negligent

maintenance or operation of a motor vehicle by a state employee; negligence of a health care employee of a state facility or institution or by a doctor, nurse, dentist, or related health care personnel employed by the state; patently dangerous conditions of a building, structure, or other public improvement owned and controlled by the state; negligent use or maintenance of state property by a state employee; defective, unsafe, or dangerous conditions of any street, alley, sidewalk, or highway owned and controlled by the state if constructive or actual notice of the condition existed; and negligent failure of a state officer or employee to properly supervise an activity at a state park or recreation facility. 1981 Md. Laws 1611–12. In 1984, the legislature added that a claim could be brought for "[t]he negligent maintenance or operation, by state personnel, of any self-propelled vehicle, including a vehicle that operates on rail, through water, or in air, or of an attachment to a vehicle." 1984 Md. Laws 1419. In 1985, the MTCA was amended, and the enumerated list of torts was eliminated. 1985 Md. Laws 2682–84. The new statute read: "Subject to the exclusions and limitations in this subtitle, the immunity of the State AND of its units is waived as to a tort action, in a court of the State, to the extent of INSURANCE coverage under Article 95, § 27(D) OF THE CODE." *Id.* at 2683–84; *see Simpson v. Moore*, 592 A.2d 1090, 1092 (Md. 1991) ("A significant change effected by the 1985 amendment was the expansion of the limited waiver of sovereign immunity from a specific list of tort actions to tort actions generally.").

That expansion—however significant—did not bespeak an intent to subject the State to suit for anything other than a tort. The amendment suggests that, rather than create a remedy for victims of some government tortfeasors but not others, the State intended to generalize the statute's applicability to the class of actions generally described as torts. Indeed, had the legislature intended its waiver of sovereign immunity in State Gov't § 12-104 to include a waiver for

16

"employment discrimination actions," *see* Pl.'s Opp'n 8, what purpose Md. Code Ann., State Gov't § 20-903, "Waiver of State's sovereign immunity in employment discrimination cases," would serve is not clear.  That waiver is limited to "employment discrimination case[s] under th[at] title." *See* State Gov't § 20-903.  That title is the MFEPA.  *See Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 102 (4th Cir. 2019).  The State has not moved to dismiss Ms. Bozarth's claims arising under the MFEPA on sovereign immunity grounds.  *See* Defs.' Mem.

The Court finds that the State did not waive its common law sovereign immunity in its own courts with respect to discrimination claims under Title I of the ADA or claims under the self-care provision of the FMLA with the enactment of the MTCA because the MTCA's waiver provision clearly applies to tort claims brought in state court, not to federal employment claims, wherever they are brought.  *See Sutton v. Dep't of Human Servs.*, No. RDB-19-0542, 2019 WL 4447379, at *3–4 (D. Md. Sept. 17, 2019) (considering whether the MTCA effected a waiver of immunity as to Title I of the ADA and noting that "[t]he MTCA waives immunity to *tort actions* brought in state court; it does not waive immunity as to all causes of actions or to claims brought under federal law").

Having found the State did not waive its sovereign immunity with respect to these claims, the Court finds that the State did not waive its Eleventh Amendment immunity by removing No. DLB-20-372 to federal court.  Plaintiff relies on *Lapides*, 535 U.S. 613 in arguing the State waived its Eleventh Amendment immunity through its litigation conduct.  Pl.'s Mem. 11–13.  *Lapides* does not compel such a finding.  In *Lapides*, the Supreme Court held that the State, which joined the removal of that case to federal court, "waived its Eleventh Amendment immunity."  535 U.S. at 624.  At the outset, however, the Supreme Court made clear that in *Lapides* it considered—and considered only—whether a State, by virtue of voluntary removal, waived its Eleventh

Amendment immunity with respect to state-law claims from which it had already waived sovereign immunity in its own courts:

> It has become clear that we must limit our answer to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings. That is because Lapides' only federal claim against the State arises under 42 U.S.C. § 1983, that claim seeks only monetary damages, and we have held that a State is not a "person" against whom a § 1983 claim for money damages might be asserted. Hence this case does not present a valid federal claim against the State. Nor need we address the scope of waiver by removal in a situation where the State's underlying sovereign immunity from suit has not been waived or abrogated in state court.

535 U.S. at 617–18. In this case, the State confines its partial motion to dismiss, in relevant part, to federal claims in respect to which it had not waived its sovereign immunity. *See* Defs.' Mem. 7–9. Thus, the Supreme Court's reasoning in *Lapides* is not on point.

Moreover, in *Lapides*, the Court emphasized that "an interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire." *Id.* at 620. The Court's concern that allowing states to claim Eleventh Amendment immunity by virtue of voluntary removal "would permit States to achieve unfair tactical advantages" makes much sense where a state would otherwise have been required to defend the action on the merits in state court. *Id.* at 621. But here, the State would have been shielded by its common law sovereign immunity in its own courts, and removal therefore served goals of consistency and efficiency without enabling the State to claim a defense otherwise unavailable to it.

This interpretation of *Lapides* is supported by existing precedent in the Fourth Circuit. The Fourth Circuit in *Stewart* held that where "North Carolina[] ha[d] not already consented to suit in its own courts," it "did not waive sovereign immunity by voluntarily removing the action to federal

court for resolution of the sovereign immunity question." *Id.* at 490.  The Court continued:

> To be precise, by "sovereign immunity" we are referring to the longstanding
> principle of state sovereign immunity implicit in the constitutional order, not the
> more narrow principle of Eleventh Amendment immunity.  As the issue is not
> presented by this case, we express no opinion as to the effect, if any, of voluntary
> removal on the availability of Eleventh Amendment immunity where the State has
> not already consented to suit in its own courts.

*Id.* at 490 n.5.  *Stewart*'s holding is confined to the common law doctrine of sovereign immunity

and thus is not directly on point as to the Eleventh Amendment question.  Yet, the Fourth Circuit's

reasoning in *Stewart* suggests that, in a case where the State has not waived its common law

immunity in its own courts, it should not waive its Eleventh Amendment immunity by removing

the case to federal court.  *See Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011)

(observing that the Supreme Court has "understood the Eleventh Amendment to confirm the

structural understanding that States entered the Union with their sovereign immunity intact").  The

Fourth Circuit distinguished *Stewart* from *Lapides* on the ground that, because North Carolina had

not consented to suit in its own courts, as Georgia had in *Lapides*, the Supreme Court's concern

over "the risk of inconsistency and unfair tactical advantage" in *Lapides* did not apply.  *Id.* at 490.

Here, as in *Stewart*, had the State remained in state court, it would not have been forced to defend

these two claims for lack of immunity.  *See id.*  Accordingly, *Stewart* suggests the State's removal

should not affect its ability to raise a defense of immunity now.

Even if rote application of *Lapides*' rule suggested the State waived its Eleventh

Amendment immunity by removing No. DLB-20-327, *Stewart* presents one other substantial

barrier for Ms. Bozarth: because the State did not waive its common law immunity with the

MTCA, *Stewart* suggests the State's common law immunity is still intact here.[4]  *See id.*; *Passaro*

---

[4] Ms. Bozarth's action in this Court is distinct from those in *Lapides* and *Stewart* on at least one
other potentially significant ground: she filed complaints alleging the same violations of law in

*v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019) ("Passaro presents two arguments for waiver. The first is that the Commonwealth waived its sovereign immunity by removing this case from state court to federal court. Our precedent forecloses this argument unless Passaro can also show that the Commonwealth has waived its immunity from the Title I [of the ADA] claim in state court. In *Stewart*, we held that where a state retains sovereign immunity from suit in state court, it does not lose that immunity by removing the case to federal court."); *Williams v. Morgan State Univ.*, No. 19-2477, --- F. App'x ----, 2021 WL 1041699, at *2 (4th Cir. 2021) (unpublished) (per curiam) ("Unlike Eleventh Amendment immunity, a state does not waive its sovereign immunity by removing a suit to federal court.").

Because the MTCA does not act as a waiver of the state's sovereign immunity as to claims arising under Title I of the ADA or the FMLA, the State retains immunity in this case—under the Eleventh Amendment and the common law principle of sovereign immunity. Consequently, Ms. Bozarth's disability discrimination claim arising under Title I of the ADA and her claim arising under the FMLA will be dismissed.

**B. Disability Discrimination**

Ms. Bozarth claims the State discriminated against her based on her disability in violation of the ADA, Section 504, and the MFEPA. ¶¶ 246–66, 297–312. Because Ms. Bozarth's discrimination claim arising under Title I of the ADA is dismissed on sovereign immunity grounds, the Court analyzes only the disability discrimination claims arising under Section 504 and the MFEPA.

---

both federal and state courts. The State may have voluntarily invoked federal jurisdiction in No. DLB-20-372, which was filed in state court, but it did not do so with respect to No. DLB-19-3615. Ms. Bozarth does not explain how the removal and consolidation of a case with an existing case in federal court—each of which enumerated the exact same claims—does not affect *Lapides*' applicability.

To state a claim of disparate treatment under Section 504, Ms. Bozarth must allege that (1) she has a disability, (2) she was otherwise qualified, and (3) she suffered an adverse action because of her disability. *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 414, 418 (4th Cir. 2015) (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995)); *see Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. 1995). The elements under the MFEPA generally mirror those under federal law. *See Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 239 (2016) (listing the elements of a disability discrimination claim based on an allegedly unlawful termination under the MFEPA, which requires, as relevant here, an adverse action) (citing Md. Code Ann., State Gov't § 20-606(a)(1)).

The State primarily argues Ms. Bozarth failed to adequately plead that she suffered an adverse employment action. *See* Defs.' Mem. 16–19. Additionally, the State advances one argument specific to Ms. Bozarth's claim under Section 504. *Id.* at 16–17. The State argues Ms. Bozarth's "vague, in the alternative allegations are not enough to satisfy the [Section 504] pleading requirement[]" that the discrimination have occurred "solely on the basis of her disability." *Id.*

*1. Adverse Action*

"An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Lewis v. Potter*, No. DKC-2008-2249, 2009 WL 2168969, at *5 (D. Md. July 17, 2009) (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102, 128 S. Ct. 955, 169 L.Ed.2d 734 (2008)). Ultimate employment actions such as "discharge, demotion, decrease in pay or benefits, loss of job, title or supervisory responsibility, or reduced opportunities for promotion" are typically required to show an adverse action. *Boone v. Goldin*, 178 F.3d 253, 255–56 (4th Cir. 1999) (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)), *abrogated on other grounds by*

*Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2008).  Reassignment, however, may amount to an adverse action "if the plaintiff can show that the reassignment had some significant detrimental effect on her."  *Id.* at 256.

The State argues that Ms. Bozarth failed to allege an "ultimate employment" action "that affects 'hiring, granting leave, discharging, promoting, [or] compensating.'"  Defs.' Mem. 17–18 (citing *Williams v. Brunswick Cnty. Bd. of Educ.*, 725 F. Supp. 2d 538, 547 (E.D.N.C. July 2, 2010); *Brockman v. Snow*, 217 F. App'x 201, 205 (4th Cir. 2017) (quoting *Page*, 645 F.2d at 233).  In the State's view, because Ms. Bozarth's leave requests all were granted and her negative performance review "did not affect…[her] terms, conditions, or benefits of employment," she has failed to allege an "adverse action."  *Id.* at 18–19.

Ms. Bozarth identifies several State actions she argues amount to "adverse actions," most notably her reassignment to an office in Region 5 to which she could not commute due to her disability.  Pl.'s Opp'n 21–22.  In response, the State argues that Ms. Bozarth failed to plead that the reassignment was to a "new position," involved "any changes in her actual job position or responsibilities," or was the source of significant new stress.  Defs.' Reply 3–4.  As to Ms. Bozarth's arguments about the commute, the State argues that "[a] change that occurs outside of the work environment itself does not affect the terms and conditions of employment[,]"  *id.* at 4, but the State cites no authority supporting this position.

*Boone*, on which Ms. Bozarth relies, is factually distinct but nonetheless provides guidance. In *Boone*, the plaintiff argued her employer discriminated against her when it reassigned her from a research laboratory to a wind tunnel.  178 F.3d at 255.  The Fourth Circuit affirmed summary judgment against her, reasoning that the reassignment did not amount to an adverse action.  *Id.* The Court held that though the plaintiff "may have experienced increased stress in the new job[,]

. . . she did not allege discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility or reduced opportunities for promotion." *Id.* (internal citation omitted). The Court acknowledged the Supreme Court's then-recent decision in *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257, 2268 (1998), which suggested that Title VII liability might flow from a "tangible employment action," including a "reassignment with significantly different responsibilities." *Boone*, 178 F.3d at 256.  Construing this possibility narrowly so as not to "provide redress for trivial discomforts endemic to employment[,]" the Fourth Circuit "conclude[d] that reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect on her." *Id.*  Further, the Court held that the plaintiff failed to demonstrate a significant detrimental effect in asserting the reassignment was "unfamiliar and more stressful," noting that "[a]bsent evidence that a new position is significantly more stressful than the last, vague allegations of stress resulting from reassignment cannot support a claim of discrimination." *Id.*

Since *Boone*, the Fourth Circuit has sketched the contours of reassignment as an adverse employment action, generally suggesting that while a reassignment to a similar albeit less favorable position likely would not amount to an adverse action, a reassignment detrimentally affecting a plaintiff's health might. *See, e.g.*, *Jyachosky v. Winter*, 343 F. App'x 871, 877 (4th Cir. 2009) (holding that the plaintiff's reassignment was not an "adverse action" where the plaintiff's salary did not change, the job titles and duties were similar, the plaintiff lost no promotion opportunities, and the plaintiff did not explain how the claims that the reassignment "would have detrimentally affected her health…would have impacted her other than the ordinary stresses of a new job"); *Von Gunten v. Maryland*, 243 F.3d 858, 868 (4th Cir. 2001) ("[W]hile . . . exposure to dangerous pathogens could adversely [a]ffect the terms, condition, or benefits of employment, von

Gunten has failed to proffer any credible evidence that her exposure to these chemicals did in fact increase in the new assignment."), *abrogated on other grounds by Burlington N.*, 548 U.S. at 59; *Sherman v. Westinghouse Savannah River Co.*, 263 F. App'x 357, 370 (4th Cir. 2008) (reversing summary judgment against an employee where the employee presented evidence that her job reassignment "subjected her to appreciably more dangerous conditions—i.e., greater exposure to potentially harmful radiation—than those she faced in her previous post").

Further, this Court has applied *Boone*'s holding and generally found reassignment—or denial of a requested reassignment—qualifies as an adverse action when coupled with detriments to a plaintiff's employment opportunities or personal well-being. *See, e.g.*, *Wyckoff v. Maryland*, No. JKB-07-58, 2008 WL 11509349, at *2 (D. Md. Oct. 9, 2008) (denying employer's motion for summary judgment because plaintiff "presented evidence that . . . denial of reassignment . . . meant the denial of opportunities for training, supervisory experience, and future promotions"); *Young v. Montgomery Cnty., Md.*, No. PX-18-2054, 2019 WL 1596992, at *5 (D. Md. Apr. 15, 2019) (finding a corrections officer sufficiently stated an adverse action where he alleged he was transferred to a different unit in which detainees "thr[e]w fecal matter, urine[,] and spit at the officers" and were more prone to violence, both of which presented "significantly greater risk[s] to the officer's physical health, safety, and wellbeing"); *cf. Rock v. McHugh*, 819 F. Supp. 2d 456, 470 (D. Md. May 26, 2011) (finding the plaintiff's transfer from an office with three windows to a shared cubicle did not constitute an adverse action).

Taking Ms. Bozarth's well-pleaded allegations as true, the Court finds Ms. Bozarth adequately alleged an adverse employment action.  Ms. Bozarth alleges the State transferred her to an office "more than a thirty[-]minute commute from [her] house" without traffic and "approximately 1.5 hour[s] … each way" with traffic.  Am. Compl. ¶ 116.  She alleges that she

"suffers from neurological Lyme disease," that this condition "substantially interferes with . . . driving," and that "her doctor indicated that she could not occupy a position that required her to commute more than thirty minutes." *Id.* ¶¶ 65, 67, 117, 118.   Ms. Bozarth requested accommodations on or around October 9, 2018, and attached "a copy of her doctor's recommendation and diagnosis." *Id.* ¶¶ 119, 121.   The State waited two months before initiating the interactive process with her. *Id.* ¶ 148.   A long commute may amount to a "trivial discomfort endemic to employment" for some individuals. *See Boone*, 178 F.3d at 256.   But Ms. Bozarth alleges that, in her case, it completely prevented her from reaching her office and doing her job, the essential functions of which she was able to perform.   Am. Compl. ¶¶ 122–28, 299.

Further, the State cites no authority for its position that "[a] change that occurs outside of the work environment itself does not affect the terms and conditions of employment." *See* Defs.' Reply 4.   What little precedent exists in this Circuit suggests a less restrictive rule than the State advocates for here. *See Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (noting that "incurring small, additional commuting expenses is not the type of adverse employment action that is cognizable under Title VII") (citing *Cooper v. United Parcel Serv., Inc.*, 368 F. App'x 469, 474 (5th Cir. 2010) (collecting cases)); *Supinger v. Virginia*, 167 F. Supp. 3d 795, 807–08 (W.D. Va. Mar. 2, 2016) (contrasting *Jensen-Graf* and noting that "… [the plaintiff's] commute increased substantially—from thirty minutes roundtrip to three hours roundtrip.   The inconvenience and expense caused by such a lengthy increase in commute time is sufficient to cause a significant detrimental effect on the terms and conditions of Supinger's employment…."); *Rose-Stanley v. Virginia*, No. 2:15CV00007, 2015 WL 6756910, at *2, *5 (W.D. Va. Nov. 5, 2015) (finding that though an employee's transfer increased her commute time from 25 minutes one way to one hour and fifteen minutes one way, the transfer was not an adverse

action because, *inter alia*, the employee "voluntarily made the same daily commute for a number of years in the past").

Additionally, Ms. Bozarth did not need to allege that the reassignment was "significantly more stressful." *See* Defs.' Reply 4–5. While in *Boone* the Fourth Circuit did discuss the relevance of stress to the adversity of a reassignment, that Court's interest in "stress" stemmed mostly from the plaintiff's proffered bases for finding the reassignment adverse. *See* 178 F.3d at 255–57. The Fourth Circuit's essential holding in *Boone* makes clear Ms. Bozarth must allege "that the reassignment had some significant detrimental effect on her." *Id.* While a marked increase in stress may, under some circumstances, amount to a significant detrimental effect, the Court has not required plaintiffs to make "stress" the origin of the detriment. *See, e.g.*, *Young*, 2019 WL 1596992, at *5 (denying in part a motion to dismiss because, *inter alia*, the plaintiff alleged a particular work assignment posed "significantly greater risk to [his] physical health, safety, and wellbeing"); *Von Gunten*, 243 F.3d at 868 (suggesting "increased exposure to dangerous pathogens" could make a reassignment an "adverse action").

Finally—and only with respect to Ms. Bozarth's discrimination claim under the MFEPA—transfer is specifically enumerated as an action potentially giving rise to a claim for discrimination. "The Maryland Commission on Human Relations promulgated regulations expounding on [the MFEPA's] proscription . . . [on discrimination] by delineating various forms of unlawful employment discrimination[,] . . . including hiring, upgrading, promotion, tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring." *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 211 (2016) (citing COMAR § 14.03.02.04(A)(2)) (internal quotation marks omitted).

Thus, with respect to both Ms. Bozarth's claims for disability discrimination under Section

504 and the MFEPA, the Court finds she adequately alleged an adverse action.

    *2.  On the Basis of Disability*

The State argues Ms. Bozarth's Section 504 claim should be dismissed because her "vague, in the alternative, allegations are not enough to satisfy the pleading requirements under Section 504[,]" which the State maintains require Ms. Bozarth to plausibly allege she was discriminated against "solely" by reason of her disability.  Defs.' Mem. 16–17 (citing *Baird*, 192 F.3d at 462). The State cites no other caselaw supporting this position.  *See id.*; Defs.' Reply.  The law governing plaintiff's Section 504 disability discrimination claim, however, is not so clear.

Section 504 is codified at 29 U.S.C. § 794.  Originally enacted in 1973, Section 504's substantive provision provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. 794(a); Pub. L. No. 93-112, Title V, § 504, Sept. 26, 1973, 87 Stat. 394 (1973).  After enacting the ADA, Congress amended Section 504 by adding, as relevant here, 29 U.S.C. § 794(d). Rehabilitation Act Amendments of 1992, Pub. L. No. 102-569, § 506, 106 Stat. 4344, 4428 (1992). Section 794(d) provides:

> The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under [T]itle I of the Americans with Disabilities Act of 1990 . . . . and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990[,] . . . as such sections relate to employment.

29 U.S.C. 794(d) (internal citations omitted).  Thus, if § 794(d)'s full effect is realized, the causation standard in employment discrimination claims will likely be supplied not by Section 504's heightened standard but by the ADA's less stringent one.  *Compare* 29 U.S.C. § 794(a) ("No otherwise qualified individual . . . shall, solely by reason of her . . . disability, be . . . subjected to

discrimination"), *with* 42 U.S.C. § 12112(a) ("[n]o covered entity shall discriminate against a qualified individual on the basis of disability").

Courts of Appeals deciding whether § 794(d) displaces § 794(a)'s "solely" standard in the context of employment discrimination claims have reached conflicting conclusions.  The Second and Fifth Circuits have applied "an established canon of construction that a specific provision 'controls over one of more general application[]'" in deciding whether the ADA's causation standard applies.  *See Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019) (reasoning that, because § 794(d) specifically applies to employment discrimination claims and § 794(a) generally applies to discrimination claims, § 794(d) is more specific and the ADA standard therefore applies) (citing *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991))  (internal citation omitted); *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002) (finding that "[t]he causation standard of § 794(a) requiring that the discrimination be 'solely by reason of her or his disability[]' is clearly . . . more specific" than the ADA's causation standard and thus § 794(a)'s standard applies).

The Fourth Circuit has not engaged in a thorough analysis of this issue like the Second and Fifth Circuits.  However, Fourth Circuit precedent suggests that the ADA's lower causation standard may apply to employment discrimination claims under Section 504.  Soon after Congress amended Section 504, the Fourth Circuit acknowledged the convergence of the standards:

> In 1992, in order to clarify the standards governing federally-funded entities, Congress amended [Section] 504 to expressly incorporate the liability standards of the ADA. Thus, whether suit is filed against a federally-funded entity under the rehabilitation Act or against a private employer under the ADA, the substantive standards for determining liability are the same.

*Myers*, 50 F.3d at 281 (reviewing dismissal of an employment discrimination claim).  Additionally, in *Miller v. Md. Dep't of Natural* Resources, 813 F. App'x 869, 872 (4th Cir. 2020) (per curiam),

the plaintiff alleged disability discrimination under the ADA, Section 504, and the MFEPA.  The Fourth Circuit analyzed the three claims together because "both [Section 504] and the [MFEPA] apply the same standards as the ADA."  *Id.* at 874, 877 (citing *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) ("The standards used to determine whether an employer has discriminated under [Section 504] are the standards applied under the [ADA] . . . .  Therefore, the general rule is that no covered entity shall discriminate against a qualified individual *because of . . . disability*.") (emphasis added)) (internal citation omitted).  Further, in *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 568 n.7 (4th Cir. 2015), the Court refused to review the dismissal of the plaintiff's Section 504 claims because the plaintiff "did not challenge the district court's finding that 'stating a claim under the Rehabilitation Act is more difficult' than under the ADA."  And, in *Reyazuddin*, the Fourth Circuit found "[e]mployment discrimination claims brought under Section 504 are evaluated using the same standards as those 'applied under [T]itle I of the [ADA,]" 789 F.3d at 413 (citing 29 U.S.C. § 794(d)), though the Court subsequently cited—but did not apply— the "solely" by reason of disability standard found in 29 U.S.C. § 794(a), *id.* at 418–19.

This Court's identification of the causation standard in Section 504 employment discrimination claims has varied.  At times, the Court has cited Section 504's "solely by reason of" standard.  *See, e.g.*, *Kerrigan v. Bd. of Educ. of Carroll Cnty.*, No. JKB-14-3153, 2016 WL 470827, at *4–6 (D. Md. Feb. 5, 2016) (finding that a plaintiff must allege discrimination "solely" by reason of disability); *Rock*, 819 F. Supp. 2d at 470–71; *Wedderburn*, 2020 WL 374458, at *5; *Nanette v. Snow*, 343 F. Supp. 2d 465, 472 (D. Md. Oct. 29, 2004); *Tafazzoli v. Nuclear Regul. Comm'n*, No. PWG-19-1638, 2020 WL 7027456, at *15 (D. Md. Nov. 30, 2020).  Yet, at other times, the Court has referenced Title I's lower "because of" standard when evaluating a Section 504 claim based on employment discrimination.  *See, e.g.*, *Shivers v. Saul*, No. JKB-19-2434, 2020

WL 7055503, at *5 (D. Md. Dec. 2, 2020) (applying Title I's lower standard and dismissing the Section 504 claim because the plaintiff used a comparator to allege discrimination but made only a "passing reference to disparate treatment unsubstantiated by any factual allegations") (citing *Terry v. Perdue*, No. JKB-18-31, 2018 WL 4494883, at *9 (D. Md. Sept. 19, 2018) (citing *Twombly*, 550 U.S. at 555)); *Washington v. Montgomery Cnty.*, No. GJH-17-3046, 2018 WL 358529, at *5 & *5 n.6 (D. Md. July 26, 2018) (analyzing a Title I, Section 504, and MFEPA claim together because the standards under all three are "the same"); *Fierce v. Burwell*, 101 F. Supp. 3d 543, 552 (D. Md. Mar. 31, 2015) (citing *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997)); *Lewis*, 2009 WL 2168969, at *5; *Payne v. Brennan*, No. PX-16-1095, 2017 WL 952677, at *3 (D. Md. Mar. 9, 2017) (citing *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)) (internal citations omitted); *Ocampo v. Brennan*, No. CCB-19-2875, 2021 WL 229673, at *5 (D. Md. Jan. 22, 2021) (referencing Title VII's standard in stating the prima facie case for disability discrimination under Section 504).

Whatever the eventual resolution of this issue may be, one thing is clear: *Baird* does not require this Court to impose the heightened causation standard in 29 U.S.C. § 794(a).  In *Baird*, the plaintiff appealed a dismissal of a claim arising under Title II of the ADA, 42 U.S.C. §§ 12131–12165.  192 F.3d at 464 (citing 42 U.S.C. § 12132 (West 1995)); *see Tennessee v. Lane*, 541 U.S. 509, 516 (2004) ("[The ADA] forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III.").  The question before the Court was whether Section 504's heightened causation standard applied to claims brought under Title II of the ADA, not what standard applied to Section 504 claims based on employment or, for that matter, the standards governing Title I of

the ADA. *Id.* at 469. Thus, *Baird* does not control this case for several reasons. First, the Court did not decide the standard under Section 504. *Id.* Second, the plaintiff was not an employee and did not bring an employment discrimination claim. *Id.* at 464. Third, the case that the Court distinguished in deciding the appropriate causation standard for the plaintiff's Title II claim, *Doe v. University of Maryland Medical System Corporation*, 50 F.3d 1261, 1264 (4th Cir. 1995) (citing 42 U.S.C. § 12132), also involved Title II of the ADA and did not address an employment discrimination claim under either the ADA or Section 504. *See id.* at 468–71; *Doe*, 50 F.3d at 1264–67 (discussing the plaintiff's allegations that he was discriminated against under Section 504 and Title II of the ADA as a medical resident of a "public entity"). And, those cases cannot be otherwise applicable here because it is well-settled that "public employment discrimination claims may not be brought under Title II" of the ADA. *Reyazuddin*, 789 F.3d at 421. *Baird* therefore provides no guidance as to whether an employment discrimination claim under Section 504 requires the plaintiff to allege discrimination "solely by reason" of her disability.

Even if, as the State argues, the heightened Section 504 standard applies, Ms. Bozarth's amended complaint plausibly entitles her to relief. *See Iqbal*, 556 U.S. at 678–79. In *Kerrigan*, the plaintiff-employee alleged discriminatory termination under the ADA and moved to amend his complaint and add a similar claim under Section 504. 2016 WL 470827, at *2. The defendant-employer opposed the motion and argued the plaintiff's motion was futile for three reasons: (1) recovery under Section 504 requires a plaintiff to show discrimination "solely" by reason of disability, (2) the plaintiff did not allege the discrimination was "solely" by reason of disability, and (3) the proposed claims were consequently "fatally flawed." *Id.* at *2, *4. The Court concluded Section 504 required a plaintiff ultimately show discrimination based "solely" on disability but noted that, "while Section 504 does impose a heightened standard for *causation*, it

does not impose a heightened standard for *pleading*." *Id.* at *4 (emphasis in original).  The "[p]laintiff . . . alleged, *inter alia*, that (1) he was terminated 'because he was temporarily unable to work due to a disability-related occupational injury[;]' . . . (2) during his brief tenure, he performed his duties satisfactorily and was never disciplined for poor performance or misconduct; and (3) [d]efendant initially informed him that he had satisfactorily completed his probationary period but then extended that period 'because of absences caused by his disability–related 'occupational injury.'" *Id.* at *5 (internal citations omitted).  The Court granted the plaintiff the opportunity to amend his complaint because "[t]hese allegations, coupled with details about [the] [p]laintiff's medical appointments and doctors' notes" permitted a plausible inference that the plaintiff was terminated solely because of his disability.  *Id.*

Similarly, in *Wedderburn*, the Court declined to dismiss a Section 504 claim though the defendant-employer argued the plaintiff failed to allege discrimination solely on the basis of disability.  2020 WL 374458, at *7.  The Court cautioned that "plaintiffs need not 'use any precise or magical words in their pleadings.'" *Id.* (citing *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 418 (4th Cir. 2014)).  The plaintiff alleged she had not had a single poor performance evaluation in her 20-year career until she became disabled.  *Id.*  She additionally alleged that she sought accommodations and was removed from the workplace, "even as she presented medical proof that she was fit to work." *Id.*  Noting that the plaintiff also pled "facts sufficient to infer [her employer's] reluctance, if not refusal, to accommodate her disabilities, hostility in the workplace, and baseless negative evaluations designed to give [the employer] pretext for termination," the Court concluded dismissal was inappropriate.  *Id.*  Indeed, the Court stated that the plaintiff had "comfortably" alleged facts plausibly entitling her to relief.  *Id.*

Several considerations frame the discussion in this case.  First, the State advanced no more

than a threadbare argument that Ms. Bozarth insufficiently pled a violation of Section 504.  *See* Defs.' Mem. 16–17.  The State cites only *Baird*, *see id.*, which does not necessarily furnish the standard in this case.  The State does not otherwise apply any facts to the law.  *See id.*  Second, though Ms. Bozarth's initial complaint did not allege she was discriminated against "solely" by reason of her disability, *see* Compl. ¶ 297, her amended complaint does allege—in the alternative to her other discrimination claims—that the State discriminated against her "solely" by reason of her disability.  *See* Am. Compl. ¶ 303.  The State takes issue with "[t]hese vague, in the alternative, allegations," Defs.' Mem. 17, but what deficiency it identifies is not clear.  The State made no similar argument with respect to Ms. Bozarth's disability discrimination claim arising under the MFEPA, which also contains a causation requirement.

While Ms. Bozarth's allegations may not be as "comfortable" at this stage as were the plaintiff's in *Wedderburn*, Ms. Bozarth nonetheless has plausibly pled her entitlement to relief. *See Iqbal*, 556 U.S. at 678–79.  Ms. Bozarth alleges that one of her supervisors previously "made disparaging remarks" about another employee's disability.  Am. Compl. ¶ 71.  She also alleges she emailed her supervisors and "complained that the situation with [Employee S] was causing [her] flare-ups of [her] disability . . . and that [she] needed the situation with [Employee S] to end as a result of her disability."  Am. Compl. ¶ 92.  Approximately two and a half hours after Ms. Bozarth sent this complaint to her supervisors, Ms. Bozarth alleges the State brought the situation to an abrupt end: Ms. Bozarth "was told that she was 'being investigated' . . . [and] that her position was reassigned to the Montgomery County Office in Rockville, Maryland."  *Id.* ¶¶ 91–98.  As discussed above, Ms. Bozarth informed the State that her disability precluded commuting to her new post and requested an accommodation, which she supported with medical documentation from her doctor.  *Id.* ¶¶ 116–21.  It appears from Ms. Bozarth's amended complaint that the State, having

been informed that Ms. Bozarth's disability precluded work in Region 5, notified Ms. Bozarth that her reassignment there would be permanent.  *Id.* ¶¶ 116–18, 126; *see Wedderburn*, 2020 WL 374458, at *7 (discussing the employer's removal of the plaintiff from the workplace after the plaintiff requested accommodations).   And, despite Ms. Bozarth initially requesting an accommodation to leave Region 5 in October 2018, the State failed to begin the interactive process with Ms. Bozarth until December 2018.  *Id.* ¶¶ 118–20, 148; *see Wedderburn*, 2020 WL 374458, at *7 (discussing the employers "reluctance, if not refusal," to accommodate her disabilities). Indeed, she did not return to Region 12 until March of the following year.  Am. Compl. ¶ 146.

Perhaps the State can refute Ms. Bozarth's allegations at summary judgment.  Her pleadings, however, survive a motion to dismiss.  Thus, the State's motion to dismiss Ms. Bozarth's disability discrimination claims under Section 504 and the MFEPA will be denied.

### C.  Violations of Title VII and the MFEPA

Ms. Bozarth argues the State discriminated against her on the basis of her sexual orientation and religion in violation of Title VII and the MFEPA.  Pursuant to Title VII, it is "an unlawful employment practice for an employer . . .  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In *Bostock v. Clayton County, Georgia*, the Supreme Court held that Title VII also prohibits discrimination based on sexual orientation.  140 S. Ct. 1731, 1754 (2020).

The prima facie case of discrimination consists of four elements: "(1) membership in a protected class; (2) satisfactory job performance; (3) [an] adverse employment action; and (4) that the adverse employment action taken was taken under circumstances giving rise to an inference of

unlawful discrimination." *Payne*, 2017 WL 952677, at *3 (citing *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)) (internal citations omitted). "The '*prima facie* case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement,'" and does not "also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Tafazzoli*, 2020 WL 7027456, at *11 (quoting *Swierkiewicz v. Sorema*, 534 U.S. 506, 510–11 (2002)). Nonetheless, the allegations must be plausible and include "facts to satisfy the elements of a cause of action created by the relevant statute." *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017); *see also Iqbal*, 556 U.S. at 678; *Bell Atlantic*, 550 U.S. at 570; *Tafazzoli*, 2020 WL 7027456, at *11.

Disparate treatment claims under the MFEPA "are assessed under the Title VII framework." *Foster v. Summer Vill. Cmty. Ass'n, Inc.*, No. 19-1199-PX, 2021 WL 615136, at *4 (D. Md. Feb. 17, 2021) (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)); *see Evans v. Md. Nat'l Capital Parks & Plan. Comm'n*, No. TDC-19-2651, 2020 WL 6703718, at *8 (D. Md. Nov. 13, 2020) ("Title VII standards also apply to employment discrimination claims under the MFEPA."). The parties analyze the state and federal claims together, and the arguments with respect to the first three elements of the Title VII and MFEPA claims are nearly identical. Defs.' Mem. 9, 13; Pls.' Opp'n 13; Defs.' Reply 3–5. Therefore, this Court will analyze the first three elements of Ms. Bozarth's Title VII and MFEPA discrimination claims in Counts I, II, III, and IV together. *See Foster*, 2021 WL 615136, at *4.

The State does not dispute Ms. Bozarth, a heterosexual female, is a member of a protected class for purposes of her sexual orientation reverse discrimination claim. Defs.' Mem. 9, 13; *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71–72 (1977) ("[S]imilarly situated employees are not to be treated differently solely because they differ with respect to race, color,

religion, sex, or national origin [or now, sexual orientation].  This is true regardless of whether the discrimination is directed against majorities or minorities.") (footnote omitted).  Likewise, the State does not dispute that Ms. Bozarth, who is Jewish, is a member of a protected class for purposes of her religious discrimination claim.  *See* Defs.' Mem. 10.  Rather, the State argues Ms. Bozarth does not state a plausible claim for relief because she does not allege that the State took an adverse employment action, that she was performing her job satisfactorily at the time of any alleged adverse employment action, or that the adverse action took place under circumstances giving rise to an inference of discrimination.  Defs.' Mem. 9–15; Defs.' Reply 3–8.

The Court assumes Ms. Bozarth's pleadings of two of the elements are sufficient for the purposes of this analysis.  First, Ms. Bozarth alleges she performed her job "outstandingly" and never received a negative performance evaluation before the conflict began with Employee S.  Am Compl. ¶¶ 28–30.  She also alleges that both times she was disciplined, she had done nothing wrong.  *See id.* ¶¶ 87–89, 107–10, 122–24.  The Court will assume Ms. Bozarth sufficiently alleges that she was performing her job satisfactorily.  Second, as to the State's argument that Ms. Bozarth failed to allege an adverse action, the Court assumes the foregoing analysis of Ms. Bozarth's disability discrimination claims under the MFEPA and Section 504 apply to Ms. Bozarth's Title VII and MFEPA claims based on sexual orientation and religion for the purposes of this analysis.

Ms. Bozarth's amended complaint, however, does not plausibly entitle her to relief because it does not contain facts giving rise to an inference of discrimination with respect to either her claim of sexual orientation discrimination or her claim of religious discrimination.  *See EEOC v. Sears Roebuck and Co.*, 243 F.3d 846, 851 n.2 (4th Cir. 2001) (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) ("What is critical with respect to the fourth element is that the plaintiff demonstrate he was not hired (or fired or not promoted, etc.) 'under circumstances

giving rise to an inference of unlawful discrimination.'"); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (citing *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 648–49 n.4); *see Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010); *Ryan v. Wolf*, No. ELH-19-1968, 2021 WL 409747, at *16 (D. Md. Feb. 5, 2021).

  1.  *Sexual Orientation Discrimination*

        As to the complaint, Ms. Bozarth claims the State discriminated against her based on her sexual orientation in violation of Title VII and the MFEPA in both Counts I and IV.  Am. Compl. ¶¶ 198–207, 232–45.  Neither the amended complaint nor the parties' briefs clearly distinguish between these counts.  *See id.*; Defs.' Mem. 13; Pl.'s Opp'n 13.  It appears that, even though Count IV is labeled as a sexual orientation discrimination claim, it is a claim for discrimination based on sex stereotyping.  *See* Am. Compl. ¶ 239 ("A motivating factor in the adverse actions suffered by Plaintiff was Plaintiff's sex and sex stereotyping."); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.").  The Supreme Court's holding in *Price Waterhouse* did not birth a new class of claim. *Bostock*, 140 S. Ct. at 1764 (Alito, J., dissenting) (observing that Title VII does not specifically prohibit discrimination based on sex stereotypes but that an employee can in theory prevail by showing sex discrimination, which may be evidenced by sex stereotyping).  Rather, *Price Waterhouse* enables plaintiffs to demonstrate sex discrimination with evidence that they were stereotyped based on their sex.  *Id.*  This does not change the elements of a discrimination claim. To the extent Ms. Bozarth argues she was stereotyped as a woman who is not sexually attracted to other women, the Court sees no difference between a claim based on sexual orientation discrimination and the claim Ms. Bozarth alleges in Count IV, given the Supreme Court's recent

ruling in *Bostock*.  *See also Churchill v. Prince George's Cnty. Pub. Sch.*, No. PWG-17-980, 2017 WL 5970718, at *5 (D. Md. Dec. 1, 2017) (noting that "it is often difficult to draw the distinction between discrimination on the basis of gender stereotyping and discrimination on the basis of sexual orientation") (quoting *Henderson v. Labor Finders of Va., Inc.*, No. 12CV600, 2013 WL 1352158, at *4 (E.D. Va. Apr. 2, 2013)).  The parties make no meaningful distinction between the claims.  Accordingly, the Court will analyze Ms. Bozarth's Title VII and MFEPA claims in Counts I and IV together.

The fourth element of a discrimination claim requiring plaintiffs plausibly plead an inference of discrimination is often satisfied by identification of a comparator.  *See, e.g.*, *Okusami v. Md. Dep't of Health and Mental Hygiene*, No. ELH-18-1701, 2020 WL 5500167, at *23–24 (D. Md. Sept. 11, 2020).  Plaintiff need not necessarily identify a similarly situated employee outside her protected class to serve as a comparator in order to survive a motion to dismiss.  *See Bryant*, 626 F.3d at 545–46 ("Bryant is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a race discrimination claim.  We would never hold, for example, that an employer who categorically refused to hire black applicants would be insulated from judicial review because no white applicant had happened to apply for a position during the time frame in question.") (internal citation omitted).  However, "'[w]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination,' the plaintiff must demonstrate at trial that the comparator is similarly situated in all relevant respects."  *Ryan*, 2021 WL 409747, at *16 (quoting *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017)).  Here, Ms. Bozarth bases her sexual orientation/sex stereotyping discrimination claims on the favorable treatment she believes Employee S received on account of Employee S's homosexuality.  Pl.'s Opp'n 19 (citing *Carson v. Giant Food, Inc.*,

187 F. Supp. 2d 462, 484 (D. Md. Feb. 20, 2002)).  Therefore, because Ms. Bozarth relies on allegations of different treatment from a comparator outside of her protected class to meet her pleading obligation under the fourth element, she must plausibly allege that Employee S was similarly situated.  *See Ryan*, 2021 WL 409747, at *16.

"The similarity between comparators . . . must be clearly established in order to be meaningful."  *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008); *Swaso*, 698 F. App'x at 748.  "Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination."  *Swaso*, 698 F. App'x at 748 (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)).  Thus, a plaintiff must allege the comparator "dealt with the same supervisor, [was] subject to the same standards and[,] . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish" the treatment the comparator received.  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (quoting *Haywood*, 387 F. App'x at 359); *see Walker*, 2020 WL 6393435, at *4; *Tafazzoli*, 2020 WL 7027456, at *14.  And, although "[c]omparators need not be identical, . . . they must be similar in all relevant aspects, including conduct, performance, and qualifications."  *Walker*, 2020 WL 6393435, at *4.  This requirement "eliminate[s] confounding variables, such as differing roles, performance histories, or decision-making personnel . . . ."  *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. PWG-17-1791, 2020 WL 5946574, at *3 (D. Md. Oct. 7, 2020) (quoting *Williams v. Silver Spring Volunteer Fire Dept.*, 86 F. Supp. 3d 398, 420 (D. Md. 2015)).

In *Tafazzoli*, the plaintiff identified "'non-deaf engineers' as her comparators" and claimed they "'received duties that were commensurate with their position,'" whereas "she was assigned

menial duties 'because of her disability,'" but she did "not identif[y] a single similarly situated coworker who was male that was treated differently as a result, nor a single similarly situated coworker who was white that was treated differently."   2020 WL 7027456, at *14 (quoting pleading).   The Court dismissed her employment discrimination claim, reasoning that she could not "nudg[e] [her] claims across the line from conceivable to plausible" because she "present[ed] only vague and conclusory allegations of different treatment from similarly situated coworkers, and she provide[d] no meaningful allegations to substantiate her claims that she was treated differently because of her *gender* or her *color.*"   *Tafazzoli*, 2020 WL 7027456, at *14 (quoting *Twombly*, 550 U.S. at 570).

In *Walker*, the Court dismissed the plaintiff's employment discrimination claim where she "allege[d] only that the Department—and not Burrows, her supervisor—was responsible for 'allow[ing] [her] colleagues . . . to telework and to have permanently assigned computers.'" 2020 WL 6393435, at *4 (quoting pleadings).   The Court noted that "[i]f different decision-makers are involved, employees are generally not similarly situated."   *Id.* (quoting *Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 F. App'x 255, 257 (4th Cir. 2007)).   Additionally, it was not clear "which of the alleged comparators held Walker's position" and did not have "'differentiating' circumstances that would distinguish 'the employer's treatment of them for it.'"   *Id.* (quoting *Haywood*, 387 F. App'x at 359); *see also Okusami*, 2020 WL 5500167, at *23–24 (finding that the plaintiff, who was a psychiatrist was not similarly situated to two employees, one of whom was a social worker and the other of whom was a psychologist, in part because the alleged comparators occupied different fields and had different qualifications).

Employee S cannot serve as a comparator.   Certainly, as a lesbian, Employee S is outside Ms. Bozarth's protected class.   Am. Compl. ¶¶ 24, 44.   And, it appears Ms. Harmon had

"supervisory authority" over her and Employee S.  *Id.* ¶ 53; *see also id.* ¶¶ 18, 44.  Yet Ms. Bozarth

fails to allege that Employee S was similarly situated because plaintiff does not allege that she and

Employee S held the same position or had the same qualifications.  *See Walker*, 2020 WL 6393435,

at *4; *Pense*, 2020 WL 5946574, at *3.  Ms. Bozarth is a "Child Care Licensing Specialist in the

Skilled Service Division of Early Childhood Development Office of Child Care" within the

MSDE.   Am. Compl. ¶ 11.   Employee S is a secretary.  *Id.* ¶ 24.   Moreover, there are

"differentiating or mitigating circumstances that . . . distinguish [Ms. Bozarth and Employee S's]

conduct or the employer's treatment of them for it."  *See Haynes*, 922 F.3d at 223–24.  Because

the two held different positions, it is not clear that Employee S's position, like plaintiff's, could

have been performed from another location.  Further, insofar as Ms. Bozarth was denied training

opportunities "vital" to her position and necessary for promotion that the Court would have found

constituted an adverse action, there is no indication that the training would have been necessary or

even relevant to Employee S's position or any possible promotion for Employee S.  Without these

similarities, Ms. Bozarth cannot show that her sexual orientation was the reason that the State took

adverse employment action against her but not against Employee S following their difficulties

working together.  *See Walker*, 2020 WL 6393435, at *4; *Pense*, 2020 WL 5946574, at *3.

Ms. Bozarth's alleged comparator is not similar in "all relevant respects" such that the

Court could infer discrimination from the State's disparate treatment of the two. *See Bryant*, 333

F.3d at 545; *see also Ryan*, 2021 WL 409747, at *16.  Therefore, her discrimination claims based

on sexual orientation and sex stereotyping will be dismissed.

     2.  *Religious Discrimination*

Ms. Bozarth does not, in contrast with her claims based on sexual orientation, identify a

comparator to connect an adverse employment action with her religion.  *Bryant*, 333 F.3d at 545;

*see* Am. Compl. ¶¶ 208–31.  Neither does she argue in her opposition that certain allegations support an inference of discrimination nor cite any caselaw suggesting that a supervisor leading employees in grace before meals gives rise to an inference of discrimination.[5]  *See* Pl.'s Opp'n 22–23.  Rather, in response to the State's partial motion to dismiss, Ms. Bozarth argues that Title VII "includes a requirement that an employer 'accommodate' an employee's religious expression, and an employee is not limited to the disparate treatment theory to establish a discrimination claim."  Pl.'s Opp'n 22 (citing *Chalmers*, 101 F.3d at 1018).

Ms. Bozarth is correct that a Title VII claim based on religious discrimination can succeed under a failure to accommodate theory.  *See Chalmers*, 101 F.3d at 1018–19.  The elements are distinct from those in the prima facie case of religious discrimination.  "To establish a prima facie religious accommodation claim, a plaintiff must establish that '(1) . . . she has a bona fide religious

---

[5] Nor could the Court identify any such caselaw.  To the contrary, guidance from the EEOC suggests the opposite: "Some employers have integrated their own religious beliefs or practices into the workplace, and they are entitled to do so."  EEOC Compliance Manual § 12-IV(C)(6) (2008).  "However, if an employer holds religious services or programs or includes prayer in business meetings, Title VII requires that the employer accommodate an employee who asks to be excused for religious reasons, including non-belief, absent a showing undue hardship."  *Id.*; *see EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 613–19 (9th Cir. 1988) (finding an employer failed to accommodate the employee-plaintiff's lack of religious belief, or atheism, in requiring the employee's attendance at religious devotional services as a term of his employment after the employee sought an exemption).  The EEOC's guidance is not binding legal authority.  *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976 (noting that "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title") (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975)); *see also Edelman v. Lynchburg Coll.*, 535 U.S. 106, 113 (2002) (distinguishing between substantive rulemaking and "suitable procedural regulations," the latter of which the EEOC may promulgate pursuant to 42 U.S.C. § 2000e-12(a)) (citing *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 257 (1991)) (internal citation omitted).  Though entitled to less weight, the EEOC's Compliance Manual is relevant to the extent it has the "power to persuade."  *Gen. Elec. Co.*, 429 U.S. at 141–42 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that an interpretive ruling, as a "body of experience and informed judgment to which courts and litigants may properly resort for guidance[,]" may receive weight dependent upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control")).

belief that conflicts with an employment requirement; (2) . . . she informed the employer of this belief; [and] (3) . . . she was disciplined for failure to comply with the conflicting employment requirement.'" *Id.* at 1019 (citing *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)) (internal citation omitted).  Ms. Bozarth did not specify in Counts II and III that she intended to plead a failure to accommodate religion claim, in contrast to her counts involving disability discrimination. *Compare* Counts II and III, Am. Compl. ¶¶ 208–31, *with* Counts V and VII, *id.* ¶¶ 246–66, 279–96.

Nor did she plead the elements of a failure to accommodate religion claim in Counts II or III.  *See* Am. Compl. ¶¶ 208–31; *Chalmers*, 101 F.3d at 1019.  Significantly, she never indicates an employment requirement conflicted with her bona fide religious belief or that she was penalized for failure to comply with the requirement.  *See Abeles v. Metro. Wash. Airports Auth.*, 676 F. App'x 170, 176 (4th Cir. 2017) ("Of particular significance is the fact that Plaintiff points to no occasion on which [her employer] denied leave when she requested leave [to observe her religious holidays] in compliance with [the employer's] Leave Policy."); *Brooks v. Greater Balt. Med. Ctr.*, No. RDB-07-2792, 2009 WL 10682039, at *4 (D. Md. Feb. 24, 2009) ("Brooks cannot satisfy any of the three prerequisites . . . .  She has offered no evidence that her religious beliefs obligated her to pray with patients and speak with them about spiritual matters.") (internal citation omitted).

Ms. Bozarth simply points to another employee who is a Jehova's Witness that sought an accommodation to skip these gatherings because the Jehova's Witness faith "does not recognize" holidays.  Pl.'s Opp'n 23; Am. Compl. ¶ 37.  That employee was "initially" required to attend the gatherings.  Am. Compl. ¶ 83.  To the extent Ms. Bozarth implies discrimination by analogy, Ms. Bozarth does not allege her religion prohibits her presence at social gatherings or her observation of others in prayer.  *See id.*  Ms. Bozarth merely alleges that that grace "is a Christian religious

custom." *Id.* ¶¶ 35–36.  And, as the State points out, Ms. Bozarth does not allege her supervisors compelled her to participate in the prayer.  *See* Defs.' Reply 8.  She, moreover, does not allege she sought a religious exemption from whatever employment requirement she alleges was inconsistent with her religion.  *See Brooks*, 2009 WL 10682039, at *4 ("Brooks . . . stated that she did not communicate to her superiors her need for accommodation.  Although Brooks claims that GMBC was aware that she was religious, she has not made the required showing that she gave notice of any need for special accommodation due to her religious beliefs.") (citing *Chalmers*, 101 F.3d at 1020) (internal citations omitted); *Dachman v. Shalala*, 9 F. App'x 186, 192 (4th Cir. 2001) ("In this case, appellant's own testimony confirmed that her decision to pick up the bread on Friday afternoon was simply her preference and not a religious requirement.  As such, her employer did not have a duty to accommodate this preference."); *Chalmers*, 101 F.3d at 1021 ("Chalmers has not pointed to any evidence that she gave Tulon—either directly or indirectly—advance notice of her need for accommodation.  For this reason, Chalmers has failed to establish a prima facie case of discrimination under the religious accommodation theory.")

"Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp.*, 550 U.S. at 555.  Because Ms. Bozarth does not identify an employment requirement conflicting with her bona fide religious belief, the Court would have to speculate as to all three elements of a failure to accommodate claim under Title VII, each of which depends on the existence of the conflict.  *See Chalmers*, 101 F.3d at 1019.  Accordingly, Ms. Bozarth's religious discrimination claims will be dismissed.

### 3.  *Dismissal with Prejudice*

The State argued in its memorandum in support of its motion to dismiss Ms. Bozarth's original complaint that she did "not allege any facts that show MSDE treated similarly situated

female non-heterosexual employees who engaged in comparable misconduct differently than her."
ECF 23-1.  The State also argued Ms. Bozarth "fail[ed] to allege any facts to support that MSDE
made any adverse decision based on her religion or religious practice."  *Id.*  Ms. Bozarth filed her
amended complaint in response to the State's original motion.  ECF 26.  Thus, she "has had the
opportunity to amend in response to [the State's] identification of pleading deficiencies but still
fails to state a claim," and therefore "dismissal with prejudice is appropriate because another
opportunity to amend would be futile."  *Woods v. Wash. Metro. Area Transit Auth.*, No. PWG-18-
3494, 2019 WL 3766508, at *7 (D. Md. Aug. 9, 2019) (citing *Weigel v. Maryland*, 950 F. Supp.
2d 811, 825–26 (D. Md. 2013)), *aff'd sub nom. Woods v. Wash. Metro. Transit Auth.*, 785 F. App'x
188 (4th Cir. 2019); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that "[i]f the
underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he
ought to be afforded an opportunity to test his claim on the merits," but "undue delay, bad faith or
dilatory motive on the part of the movant, *repeated failure to cure deficiencies by amendments
previously allowed*, undue prejudice to the opposing party by virtue of allowance of the
amendment, [and] *futility of amendment*" are reasons to deny opportunity to amend (emphasis
added)).  Therefore, Ms. Bozarth's claims alleging sexual orientation or religious discrimination
under Title VII and the MFEPA will be dismissed with prejudice.  *See Woods*, 2019 WL 3766508,
at *7.

## **ORDER**

For the reasons stated in this Memorandum Opinion and Order, it is this 31st day of March

2021 hereby ORDERED:

1.   Defendants' Motion to Dismiss, ECF 31, IS GRANTED IN PART and DENIED

     IN PART as follows:

     a.   Counts I, II, III, IV, and X are DISMISSED;

     b.   Count V is DISMISSED to the extent it alleges discrimination in violation of

          Title I of the ADA; and

2.   Defendants' answer is due April 21, 2021.


                                        _____/S/_____
                                        Deborah L. Boardman
                                        United States Magistrate Judge